## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **STEPHEN JONES AND RICHARD RENSHAW,** | |
| **Plaintiffs,** | |
| **v.** | **C.A. No.: 1:25-cv-02445** |
| **PERDUE FARMS INC., PERDUE AGRIBUSINESS LLC, AND PERDUE FOODS LLC,** | **PLAINTIFFS' FIRST AMENDED COMPLAINT** |
| **Defendants.** | |

COME NOW Plaintiffs Stephen Jones and Richard Renshaw (collectively, "Plaintiffs"), by and through their undersigned counsel, who file this Complaint against Defendants, Perdue Farms Inc., Perdue Agribusiness LLC, and Perdue Foods LLC (collectively "Perdue" or "Defendants"), and hereby allege and state as follows:

### I.        NATURE OF THE CASE

1.        This is a civil suit brought against Defendants under the citizen suit enforcement provisions of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972. Plaintiffs seek declaratory and injunctive relief, the assessment of civil penalties, attorneys' fees, and such other relief the Court deems appropriate to remedy Perdue's violations of these laws from its manufacturing plant located in Salisbury, Maryland with a mailing address of 6906 Zion Church Road, Salisbury, Maryland 21804 (the "Salisbury Agribusiness Facility").

2.        As detailed more fully below, Perdue's solid waste management practices and disposal of solid wastes containing per- and polyfluorinated alkyl substances ("PFAS") and their precursors at the Salisbury Agribusiness Facility have contaminated and are continuing to contaminate the area's groundwater and surface waters, including those used by Plaintiffs.

3.      On information and belief, Perdue has disposed of the PFAS-contaminated wastewater at the Salisbury Agribusiness Facility through spray irrigation on the land surrounding the facility.

4.      Perdue is disposing of PFAS-contaminated wastewater and other contaminants into Peggy Branch, a small stream originating at the Salisbury Agribusiness Facility, and Middle Neck Branch which borders the Salisbury Agribusiness Facility to the north.

5.      On information and belief, PFAS compounds and other contaminants are also leaching out of wastewater and sludge storage lagoons and from contaminated soil and dredge spoil disposal areas at the Salisbury Agribusiness Facility into the surrounding groundwater and surface waters.

6.      On further information and belief, Perdue is emitting PFAS compounds to the atmosphere from its disposal of solid waste particles that disperse, fall to the ground and percolate through the soil into the groundwater used for drinking water and surface waters.

7.      Perdue is in violation of federal law through its open dumping of solid waste and Perdue's actions may additionally present an imminent and substantial endangerment to health or the environment in violation of RCRA. 42 U.S.C. §§ 6945(a) and 6972(a)(1)(B).

8.      These ongoing violations harm both the drinking water and surface waters used by Plaintiffs, as well as cause harm to aquatic life, including fish and shellfish. The ongoing violations also harm the recreational, aesthetic, and/or commercial interests of citizens in the surrounding areas, including Plaintiffs. Plaintiffs seek to address violations that harm themselves and the environment through this action.

## II.        JURISDICTION AND VENUE

9.        The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§ 1331 (federal question), and 42 U.S.C. § 6972 (RCRA).

10.        On April 29, 2025, Plaintiffs notified Defendants pursuant to 42 U.S.C.

§§ 6972(b)(1)(A) and (b)(2)(A), of their intention to file suit for violations of RCRA. Plaintiffs

sent the notice letter by mail to the registered agents for Perdue Agribusiness LLC, Perdue Farms,

Inc. and Perdue Foods LLC. Plaintiffs also provided copies of the notice letter to the Maryland

Department of the Environment ("MDE") and the United States Environmental Protection Agency

("EPA").

11.        The 60-day notice period required under 42 U.S.C. § 6972(b)(1)(A) and the 90-day

notice period required under 42 U.S.C. § 6972(b)(2)(A) have now run and Plaintiffs bring this First

Amended Complaint under 42 U.S.C. §§ 6972(a)(1)(A) and (a)(1)(B).

12.        A true and correct copy of Plaintiffs' April 29, 2025, notice letter is attached hereto

as Exhibit A with documentation of its receipt attached hereto as Exhibit B.

13.        The violations identified in the notice letter are continuing at this time and are likely

to continue in the future.

14.        Neither the EPA nor MDE has commenced and is diligently prosecuting a court

action or an action under the relevant provisions of the Comprehensive Environmental Response,

Compensation and Liability Act of 1980 to redress the violations described in the notice letter and

alleged in this Complaint. *See* 42 U.S.C. § 6972(b)(1)(B), (b)(2)(B)–(C).

15.        At all times relevant herein, Perdue has purposefully availed itself of the privilege

of conducting business in the State of Maryland, has transacted business in the State of Maryland,

contracted to purchase and operate the Salisbury Agribusiness Facility in the State of Maryland,

3

regularly caused its Salisbury Agribusiness Facility to be operated in the State of Maryland, and this action arises out of business transacted in, contracts to be performed in whole or in part within Maryland, as well as actions and/or omissions committed in whole or in part within Maryland, and which occasioned and inflicted injuries upon Plaintiffs. Plaintiffs' claims arise out of or relate to Defendant Perdue's activities and contacts with the State of Maryland, and specific personal jurisdiction over Perdue is therefore proper.

16.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial portion of the events or omissions giving rise to Plaintiffs' claims took place in this judicial district, and because the property that is the subject of this action is situated in the district. Venue is proper in this Court pursuant to 42 U.S.C. § 6972(a) because the action regards alleged open dumping violations and related endangerment that occurred and is occurring in this judicial district.

### III.       PARTIES

### A.    Plaintiffs

17.    Plaintiffs each reside within close proximity to the Salisbury Agribusiness Facility. Plaintiffs have suffered, and continue to suffer, harm to their property and their recreational, aesthetic, and/or commercial interests within the area. Perdue's ongoing disposal of PFAS and other solid wastes at the Salisbury Agribusiness Facility harm Plaintiffs, in part, because these solid wastes contain pollutants that are known to be harmful to public health and the environment and to persist in the environment. These harms fall within the zone of interests protected by RCRA. Plaintiffs assert actual and/or imminent, concrete, and particularized injuries that have a causal connection to the conduct complained of in this complaint, *i.e.*, injuries that are fairly traceable to the challenged actions described herein.

18.    Stephen Jones resides at 30721 Heather Glen Drive, Salisbury, Maryland, in

Wicomico County, less than one mile from the Salisbury Agribusiness Facility. Mr. Jones's property is adjacent to Peggy Branch. Because of his concerns about water quality due to Perdue's actions, he is deterred from the use and enjoyment of his property. He is concerned that the pollution by Perdue has made the property unusable for himself and others. Mr. Jones also fears actual adverse health effects, and future effects, from the contamination on his property and of his drinking water.

19.     Richard Renshaw resides at 30625 Heather Glen Drive, Salisbury, Maryland, in Wicomico County, less than one mile from the Salisbury Agribusiness Facility. Mr. Renshaw's property is adjacent to Peggy Branch. Because of his concerns about water quality due to Perdue's actions, he is deterred from the use and enjoyment of his property. He is concerned that the pollution by Perdue has made the property unusable for himself and others. Mr. Renshaw also fears actual adverse health effects, and future effects, from the contamination on his property and of his drinking water.

20.     Mr. Renshaw additionally owns the property at 30615 Heather Glen Drive, Salisbury, Maryland. That property is adjacent to Peggy Branch. Mr. Renshaw is concerned that the pollution by Perdue has made the property at 30615 Heath Glen Drive unusable for himself and others.

21.     Plaintiffs have encountered PFAS-laden solid wastes through contamination of their drinking water, groundwater, surface water, and soil in the past and reasonably fear they will continue to encounter these solid wastes in the future, which will threaten their health and the environment.

22.     Testing of the drinking well water at the 30721 Heather Glen Drive property from a sample taken on October 21, 2024, revealed concentrations of PFOA, PFOS, and PFHxS well

above EPA's maximum contaminant levels ("MCLs") under the Safe Drinking Water Act, 42 U.S.C. § 300f, *et seq.* The testing showed concentrations of 26 parts per trillion ("ppt") of PFOA (approximately 6.5 times the MCL), 67.6 ppt of PFOS (approximately 17 times the MCL), and 92.5 ppt of PFHxS (approximately 9 times the MCL).

23.    Testing of the drinking well water at the 30625 Heather Glen Drive property from a sample taken on November 7, 2024, revealed concentrations of PFOA, PFOS, and PFHxS well above EPA's MCLs under the Safe Drinking Water Act, 42 U.S.C. § 300f, *et seq.* The testing showed concentrations of 16.6 ppt of PFOA (approximately 4 times the MCL), 163 ppt of PFOS (approximately 41 times the MCL), and 185 ppt of PFHxS (approximately 18 times the MCL).

24.    Testing of the drinking well water at the 30615 Heather Glen Drive property from a sample taken on November 7, 2024, revealed concentrations of PFOA, PFOS, and PFHxS well above EPA's MCLs under the Safe Drinking Water Act, 42 U.S.C. § 300f, *et seq.* The testing showed concentrations of 9.76 ppt of PFOA (approximately 2.5 times the MCL), 118 ppt of PFOS (approximately 30 times the MCL), and 88.6 ppt of PFHxS (approximately 9 times the MCL).

25.    Plaintiffs seek to prevent and remedy their ongoing injuries with this action. Relief from this Court addressing Perdue's noncompliance with RCRA would redress Plaintiffs' injuries, in part, by increasing the likelihood, if not ensuring, that Perdue will cease its unlawful disposal of PFAS and other solid wastes and eliminate the endangerment to health and the environment.

**B.    Defendants**

26.    Perdue Farms Inc., is a Maryland corporation that identifies its principal place of business as 31149 Old Ocean City Road, Salisbury, Maryland, in Wicomico County. Defendant Perdue Farms Inc. is authorized to conduct business within the State of Maryland. Defendant Perdue Farms Inc.'s registered agent for service in the state of Maryland is The Corporation Trust,

Incorporated located at 2405 York Road, Suite 201, Lutherville Timonium, Maryland 21093.

27.     Perdue Agribusiness LLC is a wholly-owned division of Perdue Farms engaged in the processing, sale and transport of grains, oil, and feed ingredients. Perdue Agribusiness LLC is a limited liability company registered to do business in the State of Maryland. Perdue Agribusiness LLC's principal place of business is 31149 Old Ocean City Road, Salisbury, Maryland 21804, in Wicomico County, and has a registered agent of The Corporation Trust, Incorporated located at 2405 York Road, Suite 201, Lutherville Timonium, Maryland 21093.

28.     Perdue Foods LLC is a wholly owned division of Perdue Farms. Perdue Foods LLC is a Maryland limited liability company registered to do business in the State of Maryland with a principal place of business located at 31149 Old Ocean City Road, Salisbury, Maryland 21804, in Wicomico County. Its registered agent is The Corporation Trust, Incorporated located at 2405 York Road, Suite 201, Lutherville Timonium, Maryland 21093.

29.     Collectively Perdue Farms Inc., Perdue Agribusiness LLC, and Perdue Foods LLC are referred to as "Defendants" or "Perdue" in this complaint.

30.     Perdue Agribusiness LLC and Perdue Foods LLC, both subsidiaries of Perdue Farms, are the owners and operators of an industrial property, comprised of approximately 300 acres of real property located at 6906 Zion Church Road, Salisbury, Maryland 21804 (the "Salisbury Agribusiness Facility" or "Agribusiness Facility").

## IV.    LEGAL BACKGROUND OF RCRA

31.     Enacted in 1976, the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 *et seq.,* "is a comprehensive environmental statute that governs the treatment, storage, and disposal of solid and hazardous waste." *Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 504 (4th Cir. 2015) (quoting *Meghrig v. KFC W., Inc.,* 516 U.S. 479,

483 (1996)). RCRA was passed, in part, to allow the federal government to offer technical and financial assistance to states and local governments in developing environmentally sound plans for the disposal of solid waste. *See* 42 U.S.C. § 6941. In Maryland, the Maryland Department of the Environment ("MDE") is the relevant agency that implements RCRA on the state level.

32.     Congress, in enacting RCRA, was particularly concerned with the increase in the "amounts of solid waste (in the form of sludge and other pollution treatment residues)" that had been created and the environmental and health risks posed by inadequate and unsafe disposal practices. 42 U.S.C. § 6901(b)(3). Congress found that "open dumping is particularly harmful to health, contaminates drinking water from underground and surface supplies, and pollutes the air and the land." *Id.* § 6901(b)(4). Accordingly, among the statute's objectives are "prohibiting future open dumping on the land and requiring the conversion of existing open dumps to facilities which do not pose a danger to the environment or to health." *Id.* § 6901(a)(3).

33.     42 U.S.C. § 6903(3) defines "disposal" as

the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste . . . into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including ground waters.

34.     The term "disposal" is broad and has been interpreted to not only include active actions but passive actions as well.

35.     Under 42 U.S.C. § 6903(14), an "open dump" is

any facility or site where solid waste is disposed of which is not a sanitary landfill which meets the criteria promulgated under section 6944 of this title and which is not a facility for disposal of hazardous waste.

36.     42 U.S.C. § 6903(27) defines "solid waste" as

any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility and other discarded material, including solid, liquid, semisolid, or contained gaseous material resulting

from industrial, commercial, mining, and agricultural operations, and from community activities[.]

37.     42 U.S.C. § 6972(a)(1)(B) imposes liability on any person:

including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment.

38.     Per- and polyfluoroalkyl substances ("PFAS") are a large group of over four thousand (4,000) chemical compounds, including but not limited to perfluorooctanoic acid ("PFOA"), perfluorooctane sulfonic acid ("PFOS"), and perfluorohexane sulfonic acid (PFHxS). PFOA is a carcinogen and PFOS is a possible carcinogen, as further explained below. Perdue has contaminated the land, groundwater and surface water with these substances, in violation of RCRA.

## V.     FACTUAL BACKGROUND

### A.     Excessive Levels of PFAS in the Wastewater at Defendants' Facility

39.     Defendants own and manage approximately 300 acres of real property at 6906 Zion Church Road, northeast of Salisbury, Maryland, on which they have constructed and operate a large industrial complex for grain storage, a feed mill, soybean extraction plant, an oilseeds refinery, hatcheries, and truck and railcar washing. This facility is comprised of a series of contiguous parcels of land, occupying the land which extends approximately to Route 50 to the west, Morris Leonard Road to the north, Zion Church Road to the east, and extending slightly beyond rail tracks utilized by the Defendants to the south. Property records identify Perdue Foods LLC, and Perdue Agribusiness LLC, both wholly owned subsidiaries of Perdue Farms, as the owners of this real property.

40.    Peggy Branch originates on the property of Perdue's Salisbury Agribusiness Facility and then flows south/southwest off the facility's property. Middle Neck Branch borders the Salisbury Agribusiness Facility to the north and flows west/southwest before discharging into Peggy Branch approximately 1.8 miles west of the Salisbury Agribusiness Facility.

41.    The figure attached hereto as Exhibit C shows the locations of Perdue's Salisbury Agribusiness Facility, Peggy Branch, Middle Neck Branch, and the Plaintiff's properties along with testing results from the ground water in monitoring wells on the facility's property and from the water in the drinking wells on the Plaintiffs' properties.[1] Arrows in the figure in Exhibit C indicate the regional groundwater flow direction.

42.    On information and belief, each Defendant has participated in the operation of the facility at 6906 Zion Church Road and in the conduct alleged herein, during the relevant period for which each entity existed. On information and belief, since at least 1968, this facility has been operated by Perdue Farms or one of its subsidiaries: Perdue Foods LLC and Perdue Agribusiness LLC.

43.    On information and belief, approximately 180,000 gallons of process wastewater are generated at the Agribusiness Facility each day where the wastewater then finds its way to the adjacent Peggy Branch due to the various disposal methods of Defendants.

44.    On information and belief, Defendants have spray irrigated the Agribusiness Facility's process wastewater containing PFAS on-site on approximately 40 acres of crop land or approximately 25 acres of forest, where it has contaminated groundwater that continues to migrate to Plaintiffs' properties and drains to Middle Neck Branch and Peggy Branch.

---

[1] The measurement of one part per trillion (ppt) is equivalent to one nanogram per liter (ng/L). The text throughout the complaint refers to ppt while the figure in Exhibit C refers to ng/L, but the measurements are equivalent.

45.     On information and belief, Defendants have stored and treated PFAS-contaminated process wastewater and its resultant PFAS-contaminated sludge in lagoons that continue to leak to groundwater that migrates in groundwater to Plaintiffs' properties and to Peggy Branch.

46.     On information and belief, wastewaters generated by operations at the Agribusiness Facility that have been spray irrigated on the onsite cropland and forest include hatchery process wastewater, refinery wastewater, soybean extraction wastewater, vehicle wash wastewater, and sanitary wastewater, all of which have been found to contain PFAS and other contaminants.

47.     On information and belief, MDE discovered in September 2023 that Defendants' wastewater contained highly elevated levels of PFAS compounds, including 40 parts per trillion ("ppt") of PFOA, 694 ppt of PFOS, and 319 ppt of PFHxS. This wastewater has and is continuing to drain to the groundwater which is migrating offsite towards Plaintiffs' properties and towards Peggy Branch and Middle Neck Branch.

48.     On information and belief, subsequent testing of the groundwater at the Agribusiness Facility in January 2024 revealed highly elevated levels of PFAS compounds, including 159 ppt of PFOA, 1370 ppt of PFOS, and 1520 ppt of PFHxS. The safe drinking water levels for these PFAS compounds as proposed by EPA in June 2022 and finalized by EPA in April 2024 are 4 ppt for PFOA and PFOS and 10 ppt for PFHxS.

49.     On information and belief, PFAS-contaminated water is leaching out of Defendants' wastewater and sludge storage lagoons at the Agribusiness Facility.

50.     On information and belief, Defendants have excavated and disposed of soil and dredge spoil containing PFAS and other solid waste contaminants at three or more locations at the Agribusiness Facility without permits or appropriate containment or protection to prevent the

release of PFAS and other contaminants to the groundwater, Middle Neck Branch, and Peggy Branch.

51.    On information and belief, Perdue has disposed of aqueous film-forming foam ("AFFF") used for fire suppression and containing PFAS and other contaminants to soils and groundwater near the soybean extraction plant that is continuing to drain to the groundwater and migrate offsite towards Plaintiffs' properties and to Peggy Branch.

52.    On information and belief, Perdue is emitting PFAS into the air from its manufacturing processes and solid wastes disposed at the Agribusiness Facility. Upon release to the air, PFAS in the form of fine particulates and/or aerosols are wind-driven contaminants that are deposited onto the land surface via wet (rainfall-driven) or dry (gravity-driven) deposition. Once the particles are deposited on the land surface and encounter water in streams or during rainfall events, they dissolve in water and contaminate the groundwater and surface waters including Peggy Branch and Middle Neck Branch.

**B.    Migration of PFAS from Perdue's Salisbury Agribusiness Facility Onto Plaintiffs' Property and the Surrounding Environment**

53.    On information and belief, the Agribusiness Facility overlies a shallow unconfined aquifer, known as the Salisbury Aquifer, that is susceptible to contamination from surface sources such as wastewater and other wastes disposed at or from the Agribusiness Facility.

54.    On information and belief, groundwater in the Salisbury Aquifer in the vicinity of the Agribusiness Facility is moving regionally to the west and southwest, across U.S. Route 50, at a rate of approximately 400 to 600 feet per year towards homes with shallow private wells, some of which are less than 1000 feet from the Agribusiness Facility's property. On information and belief, a portion of the local groundwater and surface water drainage on the Agribusiness Facility property is moving to the north and northwest towards Middle Neck Branch.

55.    The regional groundwater flow direction of the Salisbury Aquifer, based on available literature, and the test results of the water in private wells in residential areas downgradient from the Defendants' Agribusiness Facility (based on the limited data set of test results that have been made available to Plaintiffs' counsel) are depicted in the figure below.



56.    On information and belief, as a result of Defendants' disposal of wastewater and other solid wastes at the Agribusiness Facility, the groundwater at Defendants' Agribusiness Facility, which is migrating towards Plaintiffs' wells, exceeds the EPA's safe drinking water standard for PFOA by up to 39 times, exceeds the EPA's safe drinking water standard for PFOS by over 340 times,  and exceeds the EPA's safe drinking water standard for PFHxS by over 150 times.

57.     On information and belief, testing conducted on the drinking water wells in the Heather Glen community and other nearby communities has shown that at least 112 drinking water wells exceed the maximum allowable drinking water levels set by EPA for one or more PFAS chemicals, often at levels that are 10 to 100 times the regulatory limits, as a result of Defendants' ongoing violation of  RCRA's open dumping prohibition.

58.     On information and belief, the EPA's safe drinking water levels for multiple PFAS compounds, including PFOA, PFOS and PFHxS, have been and are presently exceeded in Plaintiffs' wells used for potable water, as a result of Defendants' ongoing violation of the RCRA open dumping prohibition.

59.     Defendants have caused the levels of PFAS compounds, including PFOA, PFOS, and PFHxS in Plaintiffs' drinking water wells to exceed the EPA safe drinking water levels through Defendants' disposal of wastewater and other solid wastes at the Agribusiness Facility.

60.     On April 26, 2024, EPA finalized a new rule setting maximum contaminant levels ("MCLs") under the Safe Drinking Water Act, 42 U.S.C. § 300f, *et seq*., to reduce exposure from a number of PFAS, including PFOA, PFOS, and PFHxS. EPA set an MCL at 4.0 ppt for PFOA and PFOS and an MCL of 10.0 ppt for PFHxS. PFAS National Primary Drinking Water Regulation, 89 Fed. Reg. 32532 (Apr. 26, 2024).

61.     On information and belief, on or about September 30, 2024, almost a year after MDE reportedly discovered the elevated levels of PFAS in its wastewater that had been sprayed on Defendants'  wastewater disposal field and forested area for approximately  10 years or more, Defendants sent letters to residents in the communities west of U.S. Route 50 advising them that Defendants would test their well water and offer to supply bottled water for drinking purposes. *See* Exhibit D.

## C.     Health Effects of PFAS

62.     PFOA, PFOS, and PFHxS are persistent in the environment and resistant to environmental degradation processes.

63.     When released into the environment, PFOA, PFOS, and PFHxS are particularly persistent in water and soil and, because of their solubility in water, can readily migrate from soil to groundwater.

64.     Moreover, due to their resistance to biodegradation, hydrolysis and photolysis and high resistance to virtually all methods of traditional purification and/or eradication, PFOA, PFOS, and PFHxS remain in the environment—and in the human body—long after their initial disposal and/or consumption/absorption.

65.     PFOA, PFOS, and PFHxS are especially concerning from a human health standpoint precisely because the chemicals can stay in the environment and in the human body for long periods of time.

66.     PFOA, PFOS, and PFHxS bioaccumulate in humans and wildlife, primarily in blood serum, kidneys, and liver. Studies have found PFOA, PFOS, and PFHxS in the blood samples of the general human population.

67.     Myriad health risks associated with exposure to PFOA, PFOS, and PFHxS exist and such risks are present even when PFOA, PFOS, and PFHxS are ingested at very low levels.

68.     Specifically, PFOA is associated with, inter alia, increased risk in humans of testicular cancer, kidney cancer, prostate cancer, endometrial/uterine cancer, breast cancer, along with thyroid disease, ulcerative colitis, pregnancy-induced hypertension, Type-2 diabetes in women, pre-eclampsia, developmental delays in children, and other health conditions.

69.     PFOS is associated with increased risk for certain cancers, including liver and kidney cancer, changes in liver function, preeclampsia, increased risks of low birth weights, decreased antibodies in children, hypothyroidism and increase thyroid disease, immunosuppression, infertility, and increased cholesterol.

70.     PFHxS is associated with liver function disruptions, thyroid and hormone level changes, developmental effects, decreased antibody response, and memory impairment.

71.     On information and belief, PFOA, PFOS, and PFHxS have the ability to cause other cancers and illnesses not yet associated with human exposure.

72.     The International Agency for Research on Cancer ("IARC"), the cancer agency of the World Health Organization ("WHO"), evaluated the carcinogenicity of PFOA and PFOS through a Working Group of 30 international experts from 11 countries meeting on November 7–14 2023, in Lyon, France. After thoroughly reviewing the extensive published literature, the Working Group classified PFOA as *carcinogenic to humans* (Group 1) and classified PFOS as *possibly carcinogenic to humans* (Group 2B). A summary of the final evaluations has been published online in *The Lancet Oncology*. On February 14, 2025, the detailed assessment was published as Volume 135 of the *IARC Monographs*.

73.     Exposure to PFAS compounds, including PFOA, PFOS, and PFHxS, poses a significant risk of "adverse effects on health or the environment." *See* 42 U.S.C. § 6944(a).

### D.      Environmental Effects of PFAS

74.     Elevated levels of PFAS in surface water systems pose a risk of adverse effects on the environment.

75.     The State of Maryland classifies bodies of water according to specific designated use classes. *See* Md. Code Regs. 26.08.02.01(B).

76.    Use Class I bodies of water have specific designated uses including swimming, fishing, the growth and propagation of fish and other aquatic life, agricultural water supply, and industrial water supply. *See id.* 26.08.02.02(B)(1).

77.    Peggy Branch and Middle Neck Branch are designated as Use Class I bodies of water by the State of Maryland. Maryland Dep't of the Env't, *Maryland's Designated Uses/Use Class Map*, https://mde.maryland.gov/programs/water/tmdl/waterqualitystandards/pages/designatedusesmaps.aspx (last visited July 22, 2025).

78.    Peggy Branch and Middle Neck Branch join together and discharge into Johnson Pond, another Use Class I body of water. *Id.*

79.    Johnson Pond is additionally designated by the State of Maryland as a Nontidal Wetland of Special State Concern, Md. Code Regs. 26.23.06.01(V)(4), which means that it has "exceptional ecological or educational value of State-wide significance," *id.* 26.23.01.01(B)(63).

80.    Johnson Pond is also designated by the State of Maryland as a Special Fisheries Management Area with special rules governing the fishing of bass in Johnson Pond. *Id.* 08.02.11.03.

81.    The North Prong Wicomico River downstream of Johnson Pond is designated as a Use Class II body of water with designated uses including those for Use Class I plus shellfish harvesting. *See id.* 26.08.02.02(B)(3), 26.08.02.08(E)(2)(d).

82.    PFAS can bioaccumulate in freshwater and marine aquatic life.

83.    In October 2024, EPA established final recommended ambient water quality criteria for aquatic life for a number of PFAS substances, including PFOA, PFOS, and PFHxS. Final Recommended Aquatic Life Criteria and Benchmarks for Select PFAS, 89 Fed. Reg. 81077 (Oct. 7, 2024).

84.     In December 2024, EPA also published proposed recommended ambient water quality criteria for the protection of human health from exposure to PFAS substances including PFOA and PFOS "to minimize the risk of adverse effects occurring to humans from chronic (lifetime) exposure to substances through drinking water and eating fish and shellfish from inland and nearshore waters." Draft National Recommended Ambient Water Quality Criteria for the Protection of Human Health for Perfluorooctanoic Acid, Perfluorooctane Sulfonic Acid, and Perfluorobutane Sulfonic Acid, 89 Fed. Reg. 105041 (Dec. 26, 2024).

85.     On information and belief, the concentrations of PFOA and PFOS in Middle Neck Branch and Peggy Branch before it discharges to Johnson Pond are approximately one thousand times or more greater than the draft criteria for consumption of fish and shellfish.

## VI.         CAUSES OF ACTION

### Count I: Violation of RCRA – Open Dumping

86.     Plaintiffs reallege and incorporate by reference the allegations of the preceding paragraphs as if repeated and set forth herein.

87.     Under 42 U.S.C. § 6972(a)(1)(A), citizens may commence a citizen suit against "any person . . . who is alleged to be in violation of any permit, standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to [RCRA]."

88.     Under RCRA, "any solid waste management practice or disposal of solid waste or hazardous waste which constitutes the open dumping of solid waste or hazardous waste is prohibited[.]" 42 U.S.C. § 6945(a).

89.     42 U.S.C. § 6945(a) further provides that "the prohibition [against open dumping] . . . shall be enforceable under section 6972 [the citizen suit provisions] of this title against persons engaged in the act of open dumping."

90.     42 U.S.C. § 6901(b) states that "disposal of solid waste … in or on the land without careful planning and management can present a danger to human health and the environment;" and that "open dumping is particularly harmful to health, contaminates drinking water from underground and surface supplies, and pollutes the air and land[.]"

91.     Perdue's practices of emitting, discharging, and/or disposing of PFAS and other contaminants on-site and off-site to soils, groundwater and surface waters without permits or other governmental authorization through their disposal of wastewater, sludge, contaminated soils and dredge spoils, and through air emissions of PFAS, constitutes open dumping of solid waste prohibited by RCRA.

92.     Perdue's continuing improper disposal of solid waste described above continues to pose an "adverse effect[] on health [and] the environment," *see* 42 U.S.C. § 6944(a), and constitutes "open dumping" in violation of 42 U.S.C. § 6945(a).

93.     Defendants continue to engage in the prohibited open dumping of solid waste at the Agribusiness Facility and are continuing to contaminate on-site and off-site groundwater and surface waters, including those used and enjoyed by Plaintiffs.

94.     Plaintiffs and the environment have been harmed and will continue to be harmed by Perdue's open dumping unless and until the Court grants the relief sought herein.

**Count II: Violation of RCRA – Pollution of Surface Water**

95.     Plaintiffs reallege and incorporate by reference the allegations of the preceding paragraphs as if repeated and set forth herein.

96.     The regulatory criteria promulgated by EPA under 40 C.F.R. Part 257 constitute the "minimum criteria" for what "constitute[s] the open dumping of solid waste[.]" *See* 42 U.S.C. § 6907(a)(3); *see also* 42 U.S.C. § 6944(a) (stating that "[a]t a minimum, such criteria shall provide

that a facility may be classified as a sanitary landfill and not an open dump only if there is no reasonable probability of adverse effects on health or the environment from disposal of solid waste at such facility.")

97.     A facility or practice violates the RCRA open dumping prohibition if it "cause[s] non-point source pollution of waters of the United States that violates applicable legal requirements implementing an areawide or Statewide water quality management plan that has been approved by the [EPA] under section 208 of the Clean Water Act ["CWA"], as amended." *See* 40 C.F.R. § 257.3-3(c).

98.     On information and belief, there is an applicable areawide or Statewide water quality management plan in Maryland that EPA has approved under section 208 of the CWA.

99.     On information and belief, Peggy Branch and Middle Neck Branch and drainage ditches and/or streams on Perdue's property are "waters of the United States" as well as surface waters of the State of Maryland subject to state regulation.

100.     Perdue's practices of emitting, discharging, and/or disposing of PFAS and other non-point source pollutants to Peggy Branch, Middle Neck Branch and other waters of the United States and the State of Maryland through non-point sources without a discharge permit from MDE violates the prohibitions contained in Md. Code Ann., Envir. §§ 9-322 and 9-323, as well as Md. Code Regs. 26.04.07.03 and 26.08.02.09A, and constitutes open dumping under 40 C.F.R. §257.3-3(c).

101.     Perdue's continuing pollution of surface water described above poses an adverse effect on health and the environment and constitutes "open dumping" in violation of 40 C.F.R. § 257.3-3(c).

102.    Defendants continue to engage in the prohibited open dumping of solid waste at the Salisbury Agribusiness Facility and are continuing to pollute on-site and off-site surface waters.

103.    Plaintiffs and the environment have been harmed and will continue to be harmed by Perdue's open dumping unless and until the Court grants the relief sought herein.

**Count III: Violation of RCRA – Contamination of Groundwater**

104.    Plaintiffs reallege and incorporate by reference the allegations of the preceding paragraphs as if repeated and set forth herein.

105.    A facility or practice violates the RCRA open dumping prohibition if it "contaminate[s] an underground drinking water source beyond the solid waste boundary[.]" 40 C.F.R. § 257.3-4(a).

106.    Perdue's practices of emitting, discharging, and/or disposing of PFAS and other contaminants on-site and off-site to soils, groundwater and surface waters without permits or other governmental authorization through its disposal of wastewater, sludge, contaminated soils and dredge spoils, and through air emissions of PFAS, has caused the contamination of groundwater that is prohibited by RCRA as a form of open dumping of solid waste.

107.    When originally promulgating the groundwater contamination criteria, EPA noted that "solid waste activities should not be allowed to cause underground drinking water sources to exceed established drinking water standards . . . [or] increase the risk of damage to present or future users of the aquifer." Criteria for Classification of Solid Waste Disposal Facilities and Practices, 44 Fed. Reg. 53438, 53446 (Sept. 13, 1979).

108.    In originally selecting the contaminants listed in 40 C.F.R. Part 257, Appendix I, which were based on the contaminants listed at the time under the National Interim Primary

Drinking Water Regulation, EPA recognized that "it may be advisable to expand the list of contaminants covered by the criteria as new information is developed by the Agency." *Id.*

109. Effective June 25, 2024, EPA adopted Maximum Contaminant Levels (MCLs) under the National Primary Drinking Water Regulation for six different PFAS including PFOA, PFOS, and PFHxS in an effort to "prevent thousands of deaths and reduce tens of thousands of serious PFAS-attributable illnesses." PFAS National Primary Drinking Water Regulation, 89 Fed. Reg. 32532 (Apr. 26, 2024).

110. Perdue has caused the levels of PFOA, PFOS, and PFHxS in the groundwater on Plaintiffs' properties, which is their source of drinking water, and in the groundwater outside Defendants' Salisbury Agribusiness Facility solid waste boundary to rise above the relevant MCLs. Perdue's continuing actions are causing the concentration of contaminants to further rise above the MCLs, posing an ongoing threat of adverse effects on health and the environment and constituting "open dumping" in violation of 40 C.F.R. § 257.3-4(a).

### Count IV: Violation of RCRA – Imminent and Substantial Endangerment

111. Plaintiffs reallege and incorporate by reference the allegations of the preceding paragraphs as if repeated and set forth herein.

112. Under 42 U.S.C. § 6972(a)(1)(B) citizens may bring a citizen suit against:

> any person . . . including any past or present generator, past or present transporter, or past or present owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an **imminent and substantial endangerment to health or the environment.**

42 U.S.C. 672(a)(1)(B) (emphasis added).

113. Perdue is a "person" within the meaning of 42 U.S.C. § 6903(15).

114.    Perdue is a past or present generator, transporter, or owner or operator of a treatment, storage, or disposal facility, who has contributed or who is contributing to the past and present handling, storage, treatment, transportation, or disposal of solid waste which may present an imminent and substantial endangerment to health or the environment.

115.    Perdue's practice of handling, treating, storing, transporting and/or disposing of solid waste, including process wastewater, sludge, manufacturing byproducts, air emissions and other disposal of solid wastes, presents an imminent and substantial endangerment to health or the environment.

116.    As described above, Perdue's treatment, storage, transportation and/or disposal of process wastewater, sludge, manufacturing byproducts, air emissions and other solid wastes  have contributed to and is contributing to elevated levels of PFOA, PFOS, PFHxS and other pollutants which  may present  an imminent and substantial endangerment to health or the environment. The pollutants of concern are known to be harmful to human health and wildlife and to persist in the environment.

117.    Plaintiffs, other citizens, and the environment are harmed and will continue to be harmed by Perdue's failure to eliminate the endangerment unless the Court grants the relief sought in this First Amended Complaint.

## VII.    REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief:

118.    Declaratory and injunctive relief pursuant to 42 U.S.C. § 6972, ordering Perdue to perform and pay for such work as may be required to (a) eliminate and remediate all  open dumping of solid waste at its property; (b) eliminate and remediate all solid waste treated, stored, transported and/or disposed of at its  property which may present an imminent and substantial endangerment

to health or the environment; (c) eliminate and remediate all offsite impacts to groundwater, surface water and soil resulting from Perdue's on-site open dumping and/or which may present an imminent and substantial endangerment to health or the environment; and (d) implement measures to prevent future open dumping and the treatment, storage, transportation and or disposal of solid wastes which may present an imminent and substantial endangerment to the public or the environment;

119.    The assessment of the maximum amount of civil penalties allowed by law, per day per violation, pursuant to 42 U.S.C. § 6928;

120.    An award of the costs of litigation, including reasonable attorney and expert witness fees, pursuant to 42 U.S.C. § 6972(e); and

121.    Such further and additional relief as the Court deems just and proper.

*[Signature page to follow]*

Respectfully submitted,

BROCKSTEDT MANDALAS FEDERICO LLC

*/s/ Philip C. Federico*
Philip C. Federico, Fed ID No. 01216
Chase T. Brockstedt (Motion to be admitted *pro hac vice* to follow)
Brent P. Ceryes, Fed ID No. 19192
A. Wray Fitch, Fed. ID No. 13722
Catherine M. Cramer (Motion to be admitted *pro hac vice* to follow)
Benjamin I. Herskovitz, Fed. ID No. 20928
Matthew P. Legg, Fed ID No. 19904
Stella D. Pratt (Motion to be admitted *pro hac vice* to follow)
2850 Quarry Lake Dr., Ste. 220
Baltimore, MD 21209
Tel: (410) 421-7777
Fax: (443) 241-7122
pfederico@lawbmf.com
cbrockstedt@lawbmf.com
bceryes@lawbmf.com
wfitch@lawbmf.com
ccramer@lawbmf.com
bherskovitz@lawbmf.com
mlegg@lawbmf.com
spratt@lawbmf.com

*Attorneys for Plaintiffs*

DATED: August 06, 2025
Baltimore, Maryland